UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

THE FEDERAL DEPOSIT INSURANCE
CORPORATION, as RECEIVER FOR
HERITAGE BANKING GROUP, FORMERLY
A MISSISSIPPI BANKING CORPORATION                    PLAINTIFF

VS.                              CIVIL ACTION NO. 3:11CV498TSL-MTP

KATHRYN DENSON, a/k/a KAT
DENSON, and PROGRESSIVE
CASUALTY INSURANCE COMPANY                           DEFENDANTS

MEMORANDUM OPINION AND ORDER

The Federal Deposit Insurance Corporation (FDIC), as Receiver
for Heritage Banking Group (the Bank), filed the present action
against Progressive Casualty Insurance Company (Progressive)
alleging that Progressive wrongly denied coverage under a
Financial Institution Bond issued to the Bank by which Progressive
agreed to indemnify the Bank for financial losses resulting from
employee dishonesty and/or fraudulent conduct.  At issue in this
case is whether the subject Financial Institution Bond provides
coverage for losses alleged to have been suffered by the Bank as a
result of certain dishonest and/or fraudulent conduct of bank
employee Kathryn Denson.  Presently, the following motions are
pending for decision:

- Progressive's motion for summary judgment;

- The Bank's motion for summary judgment;[1]

- Progressive's motion to file first amended answer (and its related request to withdraw admissions); and

- Progressive's motion for an extension of time to complete discovery.[2]

These motions have been fully briefed, and the court, having considered the memoranda of authorities together with attachments, submitted by the parties, finds and concludes as follows: Progressive's motion to file an amended answer should be granted in part, and its request to withdraw admissions denied; Progressive's motion for an extension of time to complete discovery should be granted, but only to the extent the FDIC contends discovery is necessary; and finally, both parties' summary judgment motions should be denied.

The following basic facts are not in dispute. In May 2006, upon application by the Bank, Progressive issued to the Bank a Financial Institution Bond (the Bond), with effective dates from

---

[1] Although the FDIC, as Receiver for the Bank, is now the named plaintiff, the court, like the parties, will refer to the Bank as plaintiff since all of the events giving rise to this action occurred before the FDIC was appointed Receiver.

[2] There is also pending a motion by the Bank to exclude Progressive's expert witness John W. Burdiss. Because consideration of that motion is not required in order to resolve the pending summary judgment motions, the court will for the present time defer ruling on the motion to exclude.

May 13, 2006 through May 13, 2009.  Among other coverages, the

Bond, in Part A, provided fidelity coverage for

> [l]oss resulting from dishonest or fraudulent acts
> committed by an Employee, acting alone or in collusion
> with others, with the active and conscious purpose to
> cause the Insured to sustain such loss.

> Such dishonest or fraudulent acts must be committed by
> the Employee with the manifest intent:

> (1) to cause the Insured to sustain such loss; and
> (2) to obtain an improper financial benefit for the
> Employee or another person or entity.

In 2006, Kathryn Denson was an eight-year employee of the Bank and

worked as a teller in the Bank's Highway 16 Branch in Carthage,

Mississippi.  On November 14, 2006, a dual, verified count of the

cash in the vault and teller cash dispenser at the Highway 16

Branch revealed a $209,500.00 shortage in the vault and a

$172,104.49 shortage in the teller cash dispenser, for a total of

$381,604.49.  The Bank conducted an investigation and concluded

that Denson had taken the money.  Denson's employment was

immediately terminated, as was the employment of another teller,

Linda Chancellor, who was found to have failed to conduct dual

cash counts with Denson and to report that dual cash counts were

not being conducted.  Denson was subsequently indicted for

embezzlement and for falsifying bank records (to cover up her

theft of cash from the vault of the Highway 16 Branch).  On

December 21, 2009, she pled guilty to falsifying bank records and

was sentenced by this court to imprisonment for a term of

twenty-one months and ordered to pay restitution in the amount of $381,604.49.

The Bank timely reported this loss to Progressive, and on December 27, 2006, filed a proof of loss supporting a claim for recovery under the Bond of the $381,604.49 loss it incurred as a result of Denson's dishonest and fraudulent conduct.  On December 21, 2007, following a nearly year-long investigation headed by Progressive adjuster Terrence Cawley, which included review of documents, visits to the Bank and interviews of Bank employees, Progressive denied the Bank's claim.  In its denial letter, Progressive, through Cawley, took the position that under the terms of the Bond, discussed more fully _infra_, coverage had terminated as to Denson on March 23, 2006, when an audit of the Highway 16 Branch vault, for which Denson was primarily responsible, revealed a shortage of cash, thus putting the Bank on notice of Denson's dishonest acts.

Following Progressive's denial, the Bank filed suit against Progressive in the Circuit Court of Leake County, Mississippi on January 23, 2008, contending its claim was wrongly denied and demanding payment under the Bond of the full amount of its loss, $381,604.49.[3]  The case was removed to this court on August 8,

---

[3]     The Bank's suit was first brought in November 2009 against Denson; Progressive was added via amended complaint after its denial of the Bank's claim under the Bond.

4

2011 following appointment of the FDIC as Receiver and its substitution as plaintiff herein.  Upon completion of discovery, the parties filed the present summary judgment and related motions.

Progressive offers three grounds in support of its motion for summary judgment.  First, it contends it is entitled to void the Bond due to the Bank's material misrepresentation in the application for the Bond that the Bank's vault cash was maintained under dual control, when in fact, it was not.  Second, it asserts the Bank is barred from recovery because it failed to comply with the Bond's notice and proof of loss provisions after Bank personnel discovered in March 2006 that cash was missing from the vault, or alternatively, that under the Bond's discovery provision, the Bank's recovery is limited to the approximately $30,000 found to be missing at that time.  Finally, Progressive claims the Bank cannot recover under the Bond because it has no reasonable means to calculate its loss and thus cannot sustain its burden to prove its loss.  The Bank has filed its own motion for summary judgment on its claims for breach of contract and declaratory relief, contending there is no factual or legal merit to Progressive's coverage positions and that, as a matter of law, based on the undisputed facts of record, the Bond provides coverage for the $381,604.49 loss suffered by the Bank as a result of Denson's dishonesty.

<u>Misrepresentation</u>

In the application for the Bond which the Bank completed on March 22, 2006, the Bank was asked and answered the following questions regarding the Bank's internal control over cash:

> 2. Cash controls:
> a) Are all currency shipments prepared, received, and counted under dual control?  Yes
>
> b) Are the main and reserve cash vaults in each location maintained under dual control?  Yes
>
> c) Maximum cash held in main vault of any location $750,000.

The Bank also affirmed in the application "that reasonable efforts have been made to obtain sufficient information from each and every individual or entity proposed for this insurance to facilitate the proper and accurate completion of this Application."  Progressive argues that at the time of the application, contrary to the Bank's representation, the cash vault at the Highway 16 Branch was not maintained under dual control but rather was under the unilateral control of Denson, and that consequently, the Bond is void due to the Bank's material misrepresentation.

It is undisputed that the Bank had a policy of maintaining its cash under dual control, meaning that two people together were responsible for counting cash in the vault and the cash dispenser at the Highway 16 Branch, once a week, and completing a written report to verify that the Bank was not missing any cash.  The Bank's procedures in this regard were described by Larry Waggoner, president of the Bank locations in the Leake County area, and by Shiela Craig, teller operations officer for the Bank, who

6

testified that at each branch, the head or chief teller and one other teller would enter the vault "and manually count all the cash and make sure that all the funds that were supposed to be in the bank were in fact on the premises."  The determination of how much cash should be present was based on computer printouts showing the amounts of cash that should be found in the vault and cash dispenser based on the previous day's balance, plus any amounts on tickets reflecting cash-in to the vault or cash dispenser, minus any amounts on cash-out tickets reflecting cash removed from those locations.  Once the two tellers counted all the cash and coins and noted their counts on the printout, each teller was to initial or sign the printout to indicate that they had performed the dual cash count.  The purpose of these dual cash counts was to reduce the likelihood of employee theft, as both individuals responsible for the dual count would have to be dishonest in order for a theft to go undetected by the Bank.  It is undisputed that the dual cash counts were the Bank's primary line of defense against employee theft.

According to Progressive, notwithstanding the Bank's policy of maintaining its cash under dual control, dual cash counts were not being done at the Highway 16 Branch for a period of at least six weeks prior to the date of the Bank's application with Progressive, as evidenced by a February 6 cash count tally sheet completed by Denson which had only her initials and a February 21,

2006 tally sheet which had Denson's initials and the forged

initials of Linda Chancellor, another teller.  Progressive argues

that Denson's unilateral control of the vault and cash dispenser

at the Highway 16 Branch was in direct violation of the Bank's

dual control policy and contrary to the representations made in

the Bond application.  It submits that had Bank representatives

actually made "reasonable efforts" to obtain information to

accurately complete the application, as they represented had been

done, they would have seen that dual cash counts were not being

performed; and yet the Bank did nothing to verify the accuracy of

its representation concerning dual cash controls.  Progressive

thus concludes that it cannot be genuinely disputed that the

Bank's response in the application was false.

> The Bond provides as follows:

> The insured represents that the information furnished in
> the application for this bond is complete and correct.
> Such application constitutes part of this bond.

> Any intentional misrepresentation, omission, concealment
> or incorrect statement of a material fact, in the
> application or otherwise, shall be grounds for
> rescission of this bond.

Moreover, Mississippi law holds that

> if an applicant for insurance is found to have made a
> misstatement of material fact in the application, the
> insurer that issued a policy based on the false
> application is entitled to void or rescind the policy.
> To establish that, as a matter of law, a material
> misrepresentation has been made in an insurance
> application, (1) it must contain answers that are false,
> incomplete, or misleading, and (2) the false,
> incomplete, or misleading answers must be material to

the risk insured against or contemplated by the policy. The party seeking to void the insurance contract ... must establish the existence of a factual misrepresentation and its materiality *by clear and convincing evidence*. Whether the misrepresentation was intentional, negligent, or the result of mistake or oversight is of no consequence.

Carroll v. Metropolitan Ins. and Annuity Co., 166 F.3d 802, 805 (5th Cir 1999) (citations omitted). "A misrepresentation ... is material if knowledge of the true facts would have influenced a prudent insurer in determining whether to accept the risk." Id. at 806. There is no question but that the Bank's representations regarding dual control were material.

In response to Progressive's motion as it pertains to the Bank's claimed misrepresentation, the Bank argues first that Progressive is barred from arguing the Bond should be rescinded based on misrepresentation because (1) Progressive did not deny coverage on this basis, and under the "mend the hold" doctrine recognized by the Fifth Circuit, Progressive is precluded from now asserting new grounds for its coverage position when the facts in support of the new ground were known at the time of its initial denial; and (2) Progressive did not plead misrepresentation or seek rescission in its answer or otherwise place the Bank on notice of such a defense.

In the court's opinion, regardless of the current status of the "mend the hold" doctrine in the Fifth Circuit, the fact is, in its December 2007 coverage letter, Progressive reserved the right

9

to raise additional coverage defenses and as Progressive notes,
Mississippi law allows an insurer to rely at trial on additional
defenses to coverage that were not originally given as a basis for
the insurer's refusal to pay a claim.  See Chapman v. Safeco Ins.
Co. of America, 722 F. Supp. 285, 296 (N.D. Miss. 1989) (opining
that under Mississippi law, "there is no independent rule that an
insurance company must rely at trial on the first reason for
refusing to pay the claim given the insured absent a showing that
it has somehow waived the subsequently raised defense or that
circumstances are such that the company should be estopped from
asserting that defense") (citing Bankers Life Ins. Co. v.
Crenshaw, 483 So. 2d 254, 273 (Miss. 1985), and Aetna Life &
Casualty Co. v. Lavoie, 470 So. 2d 1060 (Ala. 1985)).  The Bank
has not claimed, much less demonstrated, that the requirements of
either waiver or estoppel are present.

Further, while material misrepresentation and rescission are
affirmative defenses, see Ingraham v. United States, 808 F.2d
1075, 1078 (5th Cir. 1987) (listing rescission as affirmative
defense), Mattox v. Western Fidelity Ins. Co., 694 F. Supp. 210,
217 (N.D. Miss. 1988) (stating that misrepresentation is an
affirmative defense), and as a general rule, the failure to plead
an affirmative defense in the answer — as Progressive has done
here — usually results in a waiver of the defense, the Fifth
Circuit has made clear that "'there is some play in the joints' of

10

that general rule, and [that] '"a defendant does not waive an affirmative defense if it is raised at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond."'"  <u>Cook v. Admiral Ins. Co.</u>, 438 Fed. Appx. 313, 319, 2011 WL 3652590, 5 (5th Cir. 2011) (quoting <u>Lucas v. United States</u>, 807 F.2d 414, 418 (5th Cir. 1986)).  <u>See</u> <u>also</u> <u>Allied Chem. Corp. v. Mackay</u>, 695 F.2d 854, 855-56 (5th Cir. 1983) ("Where the matter is raised in the trial court in a manner that does not result in unfair surprise, however, technical failure to comply precisely with Rule 8(c) is not fatal.").  Progressive points out that in April 2011, while the case was still pending in state court, it filed a summary judgment motion in which it argued that the Bank's material misrepresentation regarding dual cash counts voided the policy.  Progressive concludes that the Bank cannot credibly claim prejudice since it was given sufficient notice of Progressive's position on these issues, including during the entire period of discovery under the case management order in this court.

In response, the Bank argued that even if Progressive's state court summary judgment motion served as legally adequate notice to the Bank of Progressive's misrepresentation/rescission defense, the Bank is nevertheless prejudiced in its ability to respond to that defense because by the time the state court summary judgment motion was filed, the Bank's counsel had already traveled to Ohio and deposed Progressive and its adjuster, Terrence Cawley; and

since misrepresentation/rescission had not yet been alleged by
Progressive, the Bank asked no questions of Progressive or its
adjuster that would be relevant to a misrepresentation/rescission
defense.  The Bank asserted that it would need to take discovery
on this defense if the court allowed Progressive to assert it, or
else suffer irreparable prejudice; and it would need to take
additional written and deposition discovery on this defense if the
defense were permitted by the court or else suffer irreparable
prejudice; but it objected that in order for it to take the
necessary discovery, the November 2012 trial date would have to be
continued, and it opposed a continuance, since this case has been
pending for nearly five years.

Obviously, Progressive should have moved to amend its answer
as soon as it realized it intended to seek relief from any
obligation under the Bond on the basis of a misrepresentation/
rescission defense.  At the same time, the Bank was aware from
Progressive's state court summary judgment motion that Progressive
was taking the position that a misrepresentation by the Bank
voided the Bond, and thus the Bank had ample opportunity to
conduct discovery on the issue had it chosen to do so.  In short,
neither party is without a share of responsibility for the present
situation.  However, the case has now been continued from the
November trial term and it is not presently set for trial, and in
the court's opinion, it will not prejudice the Bank to allow

Progressive to assert misrepresentation/rescission in defense of the Bank's complaint so long as the Bank is given the opportunity for such discovery on these issues as is necessary. Progressive has agreed that the Bank is entitled to such discovery and in fact, has recently moved to reopen discovery in light of the Bank's position that it will need additional discovery to respond to these new defenses, if they are allowed. The Bank opposes Progressive's motion to reopen discovery, arguing, as it relates to the misrepresentation/rescission issue, that reopening will not cure the prejudice to the Bank because (1) additional discovery on Progressive's late-claimed defenses would require the Bank to propound additional written discovery and re-depose Progressive, which would cause the Bank to incur significant additional expenses unnecessarily; (2) reopening discovery will not allow the Bank to designate an expert witness to counter Progressive's expert and will therefore not cure prejudice to the Bank, and even if the court were to permit the Bank to designate an expert, the process of conducting expert discovery would only further delay resolution of the case. However, in the face of these objections, Progressive agrees that it will submit to deposition again and will cover the Bank's reasonable expenses incurred in taking that deposition, and advises it has no objection to the Bank designating an expert witness to the extent necessary in order to address Progressive's defense of misrepresentation in the Bond

13

application.  In the court's opinion, permitting discovery by the
Bank and allowing it to designate an expert on the
misrepresentation/rescission issue should allay any prejudice the
Bank might otherwise face if Progressive is permitted to proceed
with this defense, and therefore, the defense will be permitted
and the motion to reopen discovery will be granted.[4]

In the meantime, the court may proceed with consideration of
Progressive's motion as to this issue, since on the present
summary judgment record, the court is able to readily conclude
that Progressive is not entitled to summary judgment on the merits
of its misrepresentation defense.  In the court's opinion, there
is a genuine issue of material fact as to whether the Bank's
affirmative response to the question whether the vaults at its
locations were maintained under dual control was false,
incomplete, or misleading under the circumstances.  In fact,
Progressive itself, through its adjuster, expressed the view,
after nearly a year of investigation, that the Bank's answer in
the application was accurate.  In a December 2007 trip report,
Cawley wrote:

> [T]he application [for the Bond] states the Bank
> maintains under dual control the main and reserve cash
> vaults in each location.  The Bank appears to have had
> dual control built into the regular weekly counting of
> the cash in the vault.  A breakdown occurred when

---

[4]     The parties are directed to contact the magistrate
judge's office so that he may make a determination as to the
amount of time needed to accomplish the discovery indicated.

> Denson, and the less senior tellers . . . ceased to
> carry out this account in a regular and strict manner.
> *However, the application answer seems to have been*
> *correct.*

(Emphasis added).

The Bank argues that any misrepresentation defense by
Progressive fails as a matter of law because the Bank's response
was in fact correct and that there is no room for genuine dispute
about this.  The Bank reasons that while unbeknownst to Bank
management, its dual control policy may have been disregarded at
the Highway 16 Branch for some period of time, there is no
question but that a dual control policy applied to the vaults at
every Bank location so that the specific question in the
application was answered correctly.  The application, the Bank
reasons, asked whether a dual control system was in place – and it
was; it did not ask whether management had verified that dual cash
counts were actually being performed.  The Bank asserts it could
not misrepresent something that was not asked of it and which it
did not, in fact, represent.  However, in the court's opinion, the
import of the question is not merely whether a policy existed but
whether, to the Bank's knowledge, the vaults were "maintained"
under such a policy.  Under the Bank's proffered interpretation,
regardless of the actual practice, an affirmative answer would be
accurate so long as a policy did exist, whether or not it was
being followed.  Moreover, as Progressive notes, in addition to
answering "Yes" to the question, the Bank represented that

"reasonable efforts ha[d] been made to obtain sufficient information from each and every individual or entity proposed for this insurance to facilitate the proper and accurate completion of this Application."  Whether such "reasonable efforts" were made, and/or whether such "reasonable efforts" would have revealed the disregard of the policy at the Highway 16 Branch are questions that cannot be definitively answered on this summary judgment record.[5]

        Discovery and Notice of Loss

        Progressive argues that coverage under the Bond for the loss discovered in November 2006 terminated on account of the Bank's failure to timely notify Progressive of an earlier loss discovered at the Highway 16 Branch on March 23, 2006, or that at the very least, that the Bank's recovery is limited to the approximately $30,000 Denson had stolen as of March 23, 2006, when the Bank was put on notice of her fraudulent and dishonest conduct.

_____

        [5]    The Bank finally argues that Progressive is precluded
from obtaining any recessionary relief pursuant to 12 U.S.C. §
1821(j), which states:
        Limitation on court action.  Except as provided in this
        section, no court may take any action, except at the
        request of the Board of Directors by regulation or
        order, to restrain or affect the exercise of powers or
        functions of the Corporation as a conservator or a
        receiver.
However, while § 1821(j) precludes affirmative and/or preemptive
claims for declaratory or injunctive relief, the Bank has offered
no authority for the proposition that the statute precludes
assertion of rescission as a defense to a claim by the FDIC, as
Receiver, for coverage.

The Bond includes a discovery provision, which states,

> This Bond applies to loss first discovered by the
> Insured during the Bond Period.  Discovery occurs when
> the Insured first becomes aware of facts which would
> cause a reasonable person to assume that a loss of a
> type covered by this bond has been or will be incurred,
> regardless of when the act or acts causing or
> contributing to such loss occurred, even though the
> exact amount or details of the loss may not then be
> known.

In addition, it provides the following with respect to termination

or cancellation of the Bond:

> This bond terminates as an entirety upon occurrence of
> any of the following:
> . . .
> This bond terminates as to any Employee ...
>> (a) as soon as any Insured, or any director or
>> officer of an Insured who is not in collusion
>> with such person, learns of any dishonest or
>> fraudulent act committed by such person at any
>> time, whether in the employment of the Insured
>> or otherwise, whether or not of the type
>> covered under Insuring Agreement (A), against
>> the Insured or any other person or entity,
>> without prejudice to the loss of any Property
>> then in transit in the custody of such person
>> ...
> Termination of this bond as to any Insured terminates
> liability for any loss sustained by such Insured which
> is discovered after the effective date of such
> termination.  Termination of this bond as to any
> Employee ... terminates liability for any loss caused by
> a fraudulent or dishonest act committed by such person
> after the date of such termination.

Further, the Bond requires that notice of loss be given "[a]t the

earliest practicable moment, not to exceed 30 days, after

discovery of loss, the Insured shall give the Underwriter notice

thereof," followed by a sworn proof of loss "[w]ithin 6 months

after such discovery...."

It is undisputed that on March 23, 2006, Sheila Craig, teller

operations officer for the Bank, appeared at the Highway 16 Branch

unannounced for the purpose of auditing vault cash. Craig's audit
found a shortage of approximately $30,000.[6] When Craig inquired
of Denson regarding the shortage, Denson explained that the amount
of the shortage in the vault had been overloaded into the teller
cash dispenser,[7] and she showed Craig a "cash out" ticket she had
prepared but not yet run that was in the same amount as the
shortage from the vault. Craig accepted Denson's explanation and
made no further investigation.

Progressive points out that even though she knew $30,000 was
missing from the vault, which should have alerted her that
dishonesty was afoot, Craig took no action to confirm Denson's
explanation for the missing funds, choosing instead to blindly
accept Denson's explanation without any attempt at verification.
Progressive submits that a reasonable person in Craig's position
would not have accepted Denson's story and instead would have
assumed that a loss of a type covered by the Bond had been or
would be incurred and made an investigation, which would have

---

[6]     The Bank asserts that the amount of the shortage found
by Craig on that date remains unknown. Progressive, on the other
hand, cites Craig's testimony in which she recalled that the
shortage was around $30,000. The specific amount is immaterial
for present purposes.

[7]     The teller cash dispenser is a machine that dispenses
cash to a teller based on a customer transaction. For example, if
a bank customer cashes a $100 check, rather than the teller
physically counting $100 from her teller drawer, the teller cash
dispenser dispenses $100 for the teller to give to the customer.
Under bank policy, no more than $200,000 was to be maintained in
the cash dispenser.

revealed Denson's dishonesty.  It argues that the Bank, through
Craig, thus discovered a $30,000 loss and that consequently, in
accordance with the Bond's notice of loss provision, it is not
obligated to cover *any* loss caused by Denson because the Bank
failed to give timely notice of Craig's discovery of this loss.
Progressive argues, alternatively, that under the termination and
cancellation provision, the Bond terminated as to Denson on March
23, 2006, because that is the date on which the Bank, through
Craig, first became "aware of facts which would cause a reasonable
person to assume that a loss of a type covered by th[e] bond ha[d]
been or w[ould] be incurred, regardless of when the act or acts
causing or contributing to such loss occurred, even though the
exact amount or details of the loss may not then be known."
Progressive thus contends that the only losses potentially covered
under the Bond are those occurring up to that date, i.e., the
$30,000 loss.[8]

---

[8]     In fact, this was the precise and sole reason given by
the Bank in its letter denying coverage.  Therein, Progressive
through its adjuster, Cawley, wrote:
> The Bank (through Sheila Craig) was on notice on March
> 23, 2006 of Denson's dishonest acts.  On that date,
> Craig discovered facts which would have led a reasonable
> banker to discover the dishonest act by performing a
> hand count of cash in the TCD (teller cash dispenser).
> The delay in the processing of the ticket found in the
> vault, for an entirely uncommon and unpersuasive
> described purpose (namely, the supposed desire to reduce
> the number of instances in which Denson gained entry
> into the TCD), ought to have resulted in a hand count of
> cash in the TCD.  This is especially so given that the
> purpose of Craig's visit to the branch on that date was

In <u>FDIC v. Fidelity & Deposit Co. of Maryland</u>, 45 F.3d 969, 974 (5th Cir. 1995), the bond under consideration applied to loss discovered by the Insured during the bond period, and, like the Bond at issue here, defined discovery as occurring "when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known...."  The Fifth Circuit, consistent with other courts, interpreted this clause to mean that "'discovery of loss does not occur until the insured discovers facts showing that dishonest acts occurred and appreciates the significance of those facts; suspicion of loss is not enough.'"  45 F.3d at 974 (quoting <u>FDIC v. Aetna Casualty & Sur. Co.</u>, 903 F.2d 1073, 1079 (6th Cir. 1990)) (additional citations omitted); <u>see also</u> <u>FDIC v. Fidelity & Deposit Co. of Maryland</u>, No. 3:95-CV-1094-R, 1997 WL 560616, 2 (N.D. Tex. Aug. 28, 1997) (observing that Fifth Circuit interpretation of bond's discovery definition "follows the long

---

to perform a surprise count of cash in the vault, and not all of the cash was found which should have been found.  Ms. Craig's unreasonable conduct on this occasion is further demonstrated by the fact that she personally signed off on a tally sheet which certified that $468,400 in vault cash was present in the vault on March 23, 2006 and had been counted by her, when in fact that was not true.  Cash in that amount was not there on that date and had not been counted in that amount.  Left unexplained, this tally sheet is a false bank record. The one paragraph explanation typed by Ms. Craig was prepared only after the events of November 14, 2006, and was appended to the tally sheet on or after that date.

standing rule stated by the U.S. Supreme Court that although an insured 'may have had suspicions of irregularities; he may have had suspicions of fraud, but he was not bound to act until he had acquired knowledge of some specific fraudulent or dishonest act which might involve the defendant in liability for the misconduct.'") (quoting American Sur. Co. of New York v. Pauly, 170 U.S. 133, 145, 18 S. Ct. 552, 42 L. Ed. 977 (1898)); U.S. Fidelity & Guaranty Co. v. Maxicare Health Plans, No. CIV. A. 96-2457, 1997 WL 466802, 4 (E.D. La. Aug. 12, 1997) (explaining that "[m]ere suspicion of dishonesty without factual support from which a reasonable person would assume the existence of such fraudulent or dishonest acts is insufficient [so that] in order to constitute discovery within the terms of a policy, the insured must obtain facts of a dishonest act that would lead a reasonable person to infer that a loss has been suffered[,] [making the question] whether [the insured] had knowledge of facts from which it could have reasonably inferred that [its employee] had acted dishonestly...."). In making the determination whether this standard has been met, the facts should be "viewed as they would have been by a reasonable person at the time discovery is asserted, and not as they later appeared in light of subsequently acquired knowledge." Fountainbleau Community Bank of Slidell, La. v. Fidelity & Deposit Co. of Maryland, CIV. A. No. 93-4220, 1994 WL 118334, 3 (E.D. La. Mar. 31, 1994) (quoting Wachovia Bank &

21

Trust Co. v. Manufs. Casualty Ins. Co., 171 F. Supp. 369, 375
(M.D.N.C. 1959)).

     The Bank maintains that the facts confronting Craig,
including Denson's explanation for the shortage in the vault,
would not have led a reasonable person to assume that employee
dishonesty had occurred or was likely to occur.  It submits that
Craig was warranted under the circumstances in accepting Denson's
explanation and points to Craig's testimony that although
overloading the teller cash dispenser was a violation of bank
policy and was something she had not seen done before, she still
did not find it unusual that Denson would have overloaded the cash
dispenser.  Nor was she concerned that the cash-out ticket
prepared by Denson had not been run, as she expected that this
would be done near the end of the day.  Craig testified as
follows:

          A. ... And -- but the day that I did this was -- it
          wasn't unusual to me because that's the day that you
          would load the cash dispenser to get ready for the
          weekend.  Because I think this was done on a Thursday,
          and normally we would load the cash dispenser on a
          Thursday to get ready for payrolls on Friday and
          Saturday.
          Q. Okay.
          A. So to me, I could understand where the money would be
          going to the cash dispenser.
          * * *
          A. I had -- I had a high level of confidence in Ms.
          Denson.  But with the day -- that's normally the day
          that we would load the machine to cash payroll checks.
          That was a high volume area, the Highway 16 branch, for
          payroll cashing on Fridays and Saturdays. You know, it
          wasn't only because I trusted her, but to me, that was

22

normal procedure to be putting money in the cash
dispenser that day anyway.

She further explained:

> Q. Okay.  Did you review any cash dispenser records or
> audit the cash dispenser itself to confirm what she had
> told you?
> A. I couldn't say for sure.  I mean, but if the ticket
> was -- I'm sure an in ticket would have been run, you
> know, with the cash dispenser with the vault.

In the court's opinion, there is a genuine issue of material

fact as to whether the facts presented were such that a reasonable

person would have assumed that a loss of a type covered by the

Bond had been or would be incurred.  In addition to Craig's

testimony, which would be sufficient in itself to create a triable

issue, Cawley, Progressive's own adjuster/investigator, initially

concluded that Craig's actions on March 23, 2006 were not

unreasonable.  In a March 27, 2007 "Trip Report," Crawley wrote:

> Following are my assessments of Sheila Craig and her
> story:
> I am inclined to believe her when she says the
> circumstances of the March, 2006 conversation with
> Denson did not reasonably lead her to conclude that
> Denson had engaged in a "dishonest" act, especially one
> involving document fabrication or falsification.  Her
> account assumes that, by the end of the day, Denson
> intended to submit the "cash out of the vault" ticket,
> but only after the cash balance of the machine [the
> teller cash dispenser] would naturally fall to the point
> where the balance, when added to the amount of cash
> taken out of the vault, would equal a sum less than
> $200,000. (Two hundred thousand dollars had been
> established as a limit for the machine in the software
> that attends the use of the machine and the cash
> drawers.)
> I am not aware of any facts to contradict her view (or,
> the Bank's view) that such an assumption was a
> reasonable one.  Craig says that, because she made this

assumption, she did not think the incomplete "cash out vault" ticket was marked by anything fraudulent.

In another document, undated, Crawley similarly concluded that Craig's actions on March 23, 2006 did not qualify as discovery of a loss.  In this document, Cawley wrote:

> In hindsight the supervisor [Ms. Craig] exhibited a very unfortunate degree of trust and confidence in Denson and seems to have had good reason to follow up on Denson's account.  She did not follow up, however.  I have recently concluded that this incident is not enough to conclude that the Bank, through [Ms. Craig] was aware of a dishonest act the effect of which would have been to terminate the bond as to Denson in March, 2006.  This is based on telephonic and in-person interviews and close questioning of [Ms. Craig].

Progressive, through Cawley, eventually settled on a completely contrary position, claiming that Craig discovered a presumed loss on March 23, 2006, thereby terminating the Bond as to Denson.  But the fact that Cawley previously concluded otherwise is certainly strong evidence that a reasonable jury could reach the same conclusion as Cawley first did.

Progressive goes on to argue that even if the court is not inclined to conclude as a matter of law that Craig's knowledge on March 23, 2006 of the $30,000 shortage is sufficient in itself to constitute discovery of a loss so as to terminate coverage under the Bond as to Denson, when the court factors in the Bank's knowledge that the Bank's dual control policy was not being observed at the Highway 16 Branch, it is clear beyond reasonable dispute that the Bank was aware on March 23, 2006 of Denson's

24

fraudulent and dishonest conduct.   In this vein, Progressive
points out that for at least six weeks prior to the date Craig
discovered the shortage in the vault on March 23, 2006, the Bank's
dual control policy had not been followed at the Highway 16
Branch.   It does not contend the Bank was actually aware on or
anytime prior to March 23, 2006 that the dual control policy was
being disregarded at the Highway 16 Branch; but it submits that
the Bank had in its possession as early as February 7, 2006,
easily accessible records which would have alerted the Bank to
this fact, and specifically a February 6, 2006 dual cash count
tally sheet containing both Denson's initials and those of
employee Linda Chancellor on which Chancellor's initials were
obviously forged, and a February 21, 2006 dual cash count tally
sheet initialed only by Denson.   Although there is nothing to
indicate that any Bank employee, other than Denson, ever viewed
these documents at any time prior to November 2006 (the date the
Denson loss was indisputably discovered), Progressive contends
that under Mississippi law, the Bank had imputed knowledge of the
contents of all of its records, and that therefore, by the time
Craig found the $30,000 shortage on March 23, 2006, the Bank had
imputed knowledge that dual cash counts were not being performed
at the Highway 16 Branch.   Progressive reasons that this imputed
knowledge, coupled with the discovery of the $30,000 shortage on

March 23, 2006, would have led a reasonable person to assume that Kathryn Denson was acting fraudulently or dishonestly.[9]

This argument assumes that discovery of a loss under the policy may be based on imputed knowledge, but in the court's opinion, imputed knowledge will not suffice in the circumstances presented.  To reiterate, "'discovery of loss does not occur until the insured discovers facts showing that dishonest acts occurred and appreciates the significance of those facts; suspicion of loss is not enough.'"  <u>FDIC v. Fidelity & Deposit Co. of Maryland</u>, 45 F.3d at 974.  The Bank could not *appreciate* the significance of facts of which it lacked actual knowledge.

---

[9]     Progressive also appears to contend that constructive knowledge that dual cash counts were not being performed, even without Craig's discovery of the shortage of vault cash on March 23, would lead a reasonable person to assume that Denson was acting fraudulently and thus constitute discovery of the loss.  In the court's opinion, however, even assuming the policy definition of discovery could be interpreted as encompassing constructive discovery, the court does not agree that knowledge of the fact that the dual control policy was not being followed is sufficient to constitute discovery of a loss under the Bond.  <u>See</u> <u>First Dakota Nat'l Bank v. St. Paul Fire & Marine Ins. Co.</u>, 2 F.3d 801 (8th Cir. 1993) (stating that discovery does not occur simply because it is learned that an employee failed to observe good banking practice); <u>Block v. Granite State Ins Co.</u>, 963 F.2d 1147, 1149 (8th Cir. 1992) (stating that "[i]nefficient business procedures, or irregularities and discrepancies in accounts, if as consistent with the integrity of employees as their dishonesty, does not constitute a discovery, even though dishonest acts may later be found to exist.") (quoting <u>Jefferson Bank & Trust Co. v. Central Sur. & Ins. Corp.</u>, 408 S.W.2d 825 (Mo. 1966)).

In <u>U. S. Fidelity & Guaranty Co. v. Empire State Bank</u>, 448 F.2d 360 (8th Cir. 1997), cited favorably by the Fifth Circuit in <u>FDIC v. Fidelity & Deposit Co. of Maryland</u>, the court observed,

> Discovery ... imports an awareness of the significance of known facts.  The Missouri Supreme Court particularly noted in [<u>Jefferson Bank & Trust Co. v. Central Sur. & Ins. Corp.</u>, 408 S.W.2d 825 (Mo. 1966)] that "* * * not only must the facts be known, but they also must be recognized for what they are * * *."  408 S.W.2d at 831. Applying this principle in relation to a clause effecting cancellation of a fidelity bond upon an insured discovering an employee's fraud, we recently said in <u>General Finance Corp. v. Fidelity & Casualty Co. of New York</u>, 439 F.2d 981 (8th Cir. 1971):
>
>> Appellee [bonding company] claims that the [fraudulent] acts [of the employee] were done openly, notoriously and without any attempt to hide or secrete them.  Each of the officers knew of the acts and some of the employees were in a like position.  However [,] the court found that neither the members of the board nor any of the employees of [the insured] "were aware of the true nature of the events which have given rise to the allegation by the [employer's] Trustee [in Bankruptcy]." We are of the view that this finding is correct and conclude that the bond was not cancelled through the operation of this provision. [439 F.2d at 987]

<u>Empire State Bank</u>, 448 F.2d at 364-365.  There is no suggestion that the Bank was aware when Craig found the shortage on March 23, 2006 that the dual control policy was being disregarded at the Highway 16 Branch for some time prior to that date.  Obviously, then, the Bank could not have appreciated the significance of that fact when Craig confronted the shortage in the vault on that date. Whether the shortage itself would qualify as discovery of a loss may be reasonably disputed, but the additional fact that dual cash

counts had not been and were not being performed adds nothing to the equation since the Bank was not aware of that fact.  The court rejects Progressive's argument to the contrary.

Absence of Proof of Amount of Loss

Progressive last argues in support of its motion that the Bank is not entitled to any recovery under the Bond because the Bank cannot prove its loss.  On this issue, Progressive notes that the $381,604.49 asserted by the Bank as the amount of its loss due to Denson's dishonest and/or fraudulent activities represents the difference between the amount of cash that was in both the vault and the teller cash dispenser at the time of the audit on November 14, 2006 and the amount which the Bank's computer records showed should have been in the vault and teller cash dispenser based on the cash-in and cash-out tickets entered into the Bank's computer system.  Progressive argues that since Denson has admitted (and as it is otherwise undisputed) that she falsified the cash-in and cash-out tickets, then it follows that the computer system which calculated the amount of cash that should have been in the vault and teller cash dispenser was also faulty.  Progressive therefore submits that there is no credible proof of any amount of an actual cash shortage at the Highway 16 Branch.

The Bank responded to Progressive's motion on this point arguing that Progressive is precluded from challenging the amount of the Bank's loss since Progressive expressly admitted, both in

its answer and in its response to the Bank's Rule 36 request for admissions, that "[the Bank] suffered a loss in the amount of $381,604.49 as a direct proximate result of the actions of Katherine Denson...." The Bank's response prompted a motion by Progressive to amend its answer in order to deny the Bank's allegation that it suffered a loss of $381,604.49. In support of its motion to amend, Progressive states that in its February 22, 2008 answer to the Bank's amended complaint, it admitted the Bank's allegations concerning the amount of the Bank's loss because both Progressive and its counsel were under the mistaken impression that the Bank had in fact suffered a loss of $381,604.49. According to Progressive, not until the February 15, 2011 deposition of the Bank's Rule 30(b)(6) representative, Larry Waggoner, did Progressive come to understand the impact of Denson's fabricated cash-in and cash-out tickets on the Bank's calculation of its loss. Progressive points out that when it thereafter filed a motion for summary judgment in state court in April 2011, it argued, as it does now, that because the Bank's calculation of its loss was based on faulty cash-in and cash-out tickets, the Bank had no reliable method for calculating the amount of its claimed loss and therefore could not establish any right to recovery under the Bond. Progressive contends that justice requires that it be granted leave to amend, since the Bank has been on notice since that April 2011 state court summary

judgment motion of Progressive's position on this issue and therefore would not be prejudiced by an amendment.

In addition to seeking leave to amend its answer, Progressive has also requested, albeit indirectly, leave pursuant to Federal Rule of Civil Procedure 36(b) to withdraw its September 2008 response to the Bank's request for admission in which it admitted that the Bank has sustained a loss of $381,604.49 as a result of Denson's dishonesty.[10]

Rule 36(b) states:

(b) Effect of an Admission; Withdrawing or Amending It. A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended.  Subject to Rule 16(e), the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits.  An admission under this rule is not an admission for any other purpose and

---

[10]     In its motion to amend its answer, Progressive states that "an amended answer is not necessary, as the Bank has been on notice of Progressive Casualty's position regarding these two issues since April 2011 at the latest," and explains that it filed the motion "out of an abundance of caution."  Whatever Progressive may have thought of the need to amend its answer, Progressive could not reasonably have thought it unnecessary to move for withdrawal of its admission of the amount of loss in response to the Bank's request for admissions since a matter admitted under Rule 36 is "conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."
Apparently only after filing its motion to amend did Progressive realize it had failed to move to withdraw its response to the Bank's request for admission.  The parties agreed that in order to avoid "burdening the Court with a motion by Progressive to withdraw its admission," the court should treat the motion to amend as incorporating a Rule 36 request to withdraw admission.

cannot be used against the party in any other proceeding. Fed. R. Civ. P. 36(b).  "'Rule 36(b) simultaneously emphasizes the importance of resolving an action on the merits while at the same time upholding a party's justified reliance on an admission in preparation for trial.'"  RE/MAX Intern., Inc. v. Trendsetter Realty, LLC, Civil Action No. H-07-2426, 2008 WL 2036816, 2-3 (S.D. Tex. May 9, 2008) (quoting Altman v. Ingersoll-Rand Co., No. 05-956, 2008 WL 596066, at *3 (W.D. Pa. March 4, 2008)).  In reviewing a motion to withdraw under Rule 36(b), the court must consider whether withdrawal "would promote the presentation of the merits of the action," and whether withdrawal "would prejudice the requesting party in maintaining or defending the action on the merits."  Fed. R. Civ. P. 36(b).  See also In re Carney, 258 F.3d 415, 419 (5th Cir. 2001).  "Even when these two factors are established, a district court still has discretion to deny a request for leave to withdraw or amend an admission."  Id.; see also Donovan v. Carls Drug Co., 703 F.2d 650, 652 (2d Cir. 1983) ("Because the language of [Rule 36(b)] is permissive, the court is not required to make an exception to Rule 36 even if both the merits and the prejudice issues cut in favor of the party seeking exception to the rule.").

The first half of the test in Rule 36(b) asks "whether denying withdrawal would have the practical effect of eliminating any presentation of the merits of the case...."  Le v. Cheesecake

31

<u>Factory Restaurants Inc.</u>, No. 06-20006, 2007 WL 715260, 2 (5th Cir. Mar. 6, 2007) (citing <u>Hadley v. U.S.</u>, 45 F.3d 1345, 1348 (9th Cir. 1995)).  Here, while Progressive will be foreclosed from challenging the amount of the Bank's loss if the court denies its request to withdraw its admission, Progressive will not be deprived of a defense on the merits of the coverage issues, which are addressed in some detail herein.[11]  But even were the court to assume that this part of the test is met, the court is persuaded that denial of Progressive's request to withdraw is nevertheless warranted due to prejudice the Bank would face in defending the action if the request to withdraw were granted and due to Progressive's complete lack of diligence in seeking to withdraw its admission.

Shortly after Progressive's response to the Bank's request for admission was served in September 2008, an order was entered staying the case during the pendency of Denson's criminal case. After the stay was lifted in August 2010, discovery resumed and in February 2011, Progressive took Waggoner's deposition, from which it supposedly came to understand the alleged fallacy in the Bank's claimed loss figure.  Two months later, on April 8, 2011,

---

[11]     The court notes that Denson has been ordered by this court to pay restitution in the amount of $381,604.49.  Of course, that does not mean that this is the exact amount of the Bank's loss.  But it is notable that Denson did not challenge the loss computation.  The court also notes that it cannot reasonably be denied that the Bank did, in fact, suffer a substantial loss as a result of Denson's dishonesty.

Progressive filed its first summary judgment motion in state court, and did make its argument at that time regarding the lack of reliable data for the Bank's claimed loss figure.  However, one week later, on April 15, 2011, the Bank was declared insolvent and placed in receivership, with the FDIC appointed as receiver, following which on May 10, 2011, the FDIC was substituted as plaintiff herein.

According to the Bank, because Progressive had already admitted the amount of the Bank's loss in multiple pleadings, the documents necessary to prove damages were not located and preserved prior to the Receivership.  The Bank thus contends it would suffer irreparable prejudice if it is now forced to prove the amount of its loss because the documents necessary to prove the loss cannot now be located following the Receivership.  This is precisely the kind of prejudice that counsels against allowing withdrawal of Progressive's admission.  That is, while losing "the benefit of not having to prove [a] case on the merits," including the increased expenses caused by the need for additional discovery to replace withdrawn admissions, "is not the type of prejudice that satisfies Rule 36(b)[,]" Harmless v. Elec. Control Security, Inc., No. 1:07-cv-146-SEB-WTL, 2008 WL 686999, at *1 (S.D. Ind. March 10, 2008), "[c]ourts have usually found that the prejudice contemplated by Rule 36(b) relates to special difficulties a party may face caused by a sudden need to obtain evidence upon

33

withdrawal or amendment of an admission," <u>Le</u>, 2007 WL 715260, at 3 (quoting <u>Am. Auto. Ass'n v. AAA Legal Clinic of Jefferson Crooke, P.C.</u>, 930 F.2d 1117, 1120 (5th Cir. 1991)).   <u>See</u> <u>also</u> <u>Perez v. Miami-Dade County</u>, 297 F.3d 1255, 1266 (11th Cir. 2002) ("The prejudice contemplated by the Rule ... relates to the difficulty a party may face in proving its case, e.g., caused by the unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously answered by the admissions.").

Further, the Fifth Circuit has held that "a court acts within its discretion in considering the fault of the party seeking withdrawal, or its diligence in seeking withdrawal." <u>Le</u>, 2007 WL 715260, at 2 (citing <u>Pickens v. Equitable Life Assurance Soc.</u>, 413 F.2d 1390, 1394 (5th Cir. 1969), and <u>Covarrubias v. Five Unknown INS/Border Patrol Agents</u>, 192 F. App'x 247, 248 (5th Cir. 2006) (per curiam) (unpublished)).   No reasonable argument can be made that Progressive acted with diligence in seeking to withdraw its admission.   It did not move for withdrawal of its admission promptly upon its ostensibly learning that the basis for its admission was incorrect; it did not do so before filing its state court summary judgment motion; it did not do so during the year-and-a-half that discovery was ongoing in the state court action and then in this federal action following removal; it did not do so prior to filing its summary judgment motion in this court; and

34

even when it filed its motion to amend its answer (which it did only out of an abundance of caution), Progressive did not move to withdraw its admission.  What finally prompted Progressive to action is unknown.  Also unknown, given Progressive's lack of explanation, is why Progressive failed to act sooner.[12]  Certainly it has offered no good cause for its inaction.  Under the circumstances, the court is of the opinion that the request to withdraw should be denied.

Based on all of the foregoing, it is ordered that the parties' summary judgment motions are denied, that Progressive's motion to amend its answer is granted, in part, as set forth herein, that Progressive's request to withdraw admission is denied, and that Progressive's motion to reopen discovery is granted, as set forth herein.

SO ORDERED this 7[h] day of November, 2012.


                              /s/ Tom S. Lee
                              UNITED STATES DISTRICT JUDGE


------

[12]    The court would simply observe that Progressive's attempts to fault the Bank for Progressive's own lack of diligence are unjustified.